AUSA: Barrington Wilkins Telephone: (313) 226-9621
Agent: Tyler Bennett Telephone: (313) 226-6400
AO 91 (Rev. 11/11) Criminal Complaint

# UNITED STATES DISTRICT COURT
for the
Eastern District of Michigan

United States of America
   v.
Harry ZEER
Art PATTO

Case No.    Case: 2:21−mj−30062
Assigned To : Unassigned
Assign. Date : 2/3/2021
USA V. ZEER, ET AL. (CMP)(CMC)

## CRIMINAL COMPLAINT

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.

On or about the date(s) of __March 2013 thru March 2018__ in the county of __Wayne__ in the __Eastern__ District of __Michigan__, the defendant(s) violated:

| Code Section | Offense Description |
|---|---|
| Title 18, United States Code, Section 2314 | Interstate Transportation of Stolen Goods |
| Title 18, United States Code, Section 2315 | Interstate Sale or Receipt of Stolen Goods |
| Title 18, United States Code, Section 371 | Conspiracy Against the United States |

This criminal complaint is based on these facts:
See attached.

☑ Continued on the attached sheet.

*Tyler Bennett*
*Complainant's signature*

SA Tyler Bennett, U.S. Secret Service
*Printed name and title*

Sworn to before me and signed in my presence.

Date: __February 3, 2021__

*Judge's signature*

City and state: __Detroit, Michigan__    R.Steven Whalen, United States Magistrate Judge
*Printed name and title*

Save    Print

# AFFIDAVIT IN SUPPORT OF A COMPLAINT

I, Tyler Bennett, being first duly sworn, hereby depose and state as follows:

## INTRODUCTION AND AGENT BACKGROUND

1. I am an investigative or law enforcement officer of the United States within the meaning of Section 2510(7) of Title 18, of the United States Code. I am empowered to conduct investigations of and to make arrests for offenses enumerated in Title 18 of the United States Code.

2. I am a Special Agent employed by the United States Department of Homeland Security, United States Secret Service (USSS), assigned to the Detroit Field Office. I have been so employed since August of 2017. My responsibilities and duties include the investigation and enforcement of laws and regulations related to financial crimes. Since December 2018, I have been assigned to the Fraud squad, where I participate in identity theft, access device fraud, mail fraud, wire fraud, and bank fraud investigations. This affidavit is made in support of a criminal complaint and arrest warrant for HARRY ZEER and ART PATTO for violating 18 U.S.C. § 2314 (transportation of stolen goods), § 2315 (sale or receipt of stolen goods), and 18 U.S.C. 371 (conspiracy).

3. This affidavit is submitted for the limited purpose of securing a criminal

3

complaint and arrest warrant; therefore, this affidavit does not contain every fact that I have learned during the course of the investigation. I have only set forth the facts necessary to establish probable cause to believe that HARRY ZEER and ART PATTO violated the statutes identified above. The information contained in this affidavit is based upon my personal knowledge, training and experience, as well as the combined knowledge, training and experience of other law enforcement officers, agents and analysts with whom I have had discussions.

**PROBABLE CAUSE**

4. The United States Secret Service and the United States Postal Inspectors Service is conducting a criminal investigation of HARRY ZEER and ART PATTO regarding violations of 18 U.S.C. § 2314 (transportation of stolen goods), § 2315 (sale or receipt of stolen goods), and 18 U.S.C. § 371 (conspiracy).

5. I-Exchange, an authorized MetroPCS dealer, is located at 10001 Telegraph Road, Redford, MI 48239. I-Exchange is owned by Harry ZEER ("ZEER"). ZEER resides at 6211 Lynn Court, West Bloomfield, MI 48323.

6. A confidential source of information has supplied information utilized in this investigation. This source, hereinafter identified as "Source-1" provided information to another federal law enforcement agency for the past several years that has resulted in

three separate investigations that culminated in three felony arrests and the seizure of approximately $125,000.00. In connection with this investigation, Source-1 has provided information to the USSS that has been independently verified. Additionally, Source-1 has provided information against Source-1's self-interest. Source-1's information has been deemed reliable and credible.

7. During the course of this investigation, which occurred between 2013 and 2018, Source-1 advised that one side of the business located at 10001 Telegraph Road, Redford, MI 48239 was utilized for purchasing mobile phones and the other side was utilized as a Money Service business, (MSB). 1001 Telegraph Road is also where I-Exchange conducted its illegal activities, to wit: the illegal sale of stolen electronics.

8. As shall be described herein, the investigation has revealed that I-Exchange is buying large quantities of mobile phones (mostly Apple iPhones) and other assorted electronic devices (iPods, iPads, etc.) from individuals who shall be identified herein as "recruiters." Many of the recruiters are repeat customers who have sold tens of thousands of dollars of brand new iPhones to I-Exchange. These cell phones and other electronic devices are being acquired by other individuals via contract fraud, identity theft, and larcenies. After a recruiter sells an electronic device to I-Exchange, an I-Exchange employee issues the recruiter a check. I-Exchange advises the recruiter to go to a liquor store. This liquor store is approximately one and one half miles from I-Exchange. I-Exchange sells the electronic devices purchased from recruiters to one of

several electronic wholesalers and generally receives wires of the proceeds of these sales into their respective business accounts.

9. The local liquor store is registered as a Michigan business, identification number: xxx601 to X Enterprises, Inc. with Person No. 1, listed as resident agent. also associated with this unlicensed Money Service Business ("MSB") is Person No. 2.

10. Source-1 has advised that Source-1, and other recruiters, find individuals who shall be referred to herein as 'mules' to go to various Verizon Wireless stores to purchase a brand new mobile phone with a service contract. When a customer agrees to enter a service contract for the phone, Verizon sells the mobile phone at a heavily discounted rate. For example, an iPhone 6 or 6S with a retail value of $649.99 is sold for $199.00 with a 2-year contract. The contract is then provided to the customer from the Store's computer where it was transmitted over the Verizon Secure Network. The recruiter provides the mule with funds to purchase the mobile phone and the mule agrees to enter into a phone service contract with Verizon. The mule has no intention of fulfilling the terms contract, and immediately turns the phone over to the recruiter in exchange for a small sum of money.

11. In addition to obtaining the first iPhone fraudulently, the recruiter will, in some instances, then obtain the mule's identification (DOB, SSN, etc.) and then contact Verizon, (or its third party insurance company, Assurion) to complain the phone is not "working properly." In some instances, Verizon/Assurion Customer Service

Representatives make arrangements to send the recruiter (posing as the mule/customer) another new iPhone to replace the "damaged" phone. The recruiter will then have two new iPhones to sell to I-Exchange, thus increasing the recruiter's profit by over 50%. Sometimes the recruiter will repeat this step multiple times to obtain new iPhones. The recruiter takes all of the phones obtained in the manner described to I-Exchange to sell.

12. At I-Exchange, the phones are examined to make sure they are in working order. An I-Exchange employee then asks the recruiter to fill out and sign an I-Exchange form. The form requires the recruiter to agree that the phones are not "stolen or subsidized." Source-1 advised that this is the same process that ART PATTO's previous business, I Buy, engaged in before it was shut down by law enforcement. Source-1 further advised that Source-1 was never asked about where the phones came from or how Source-1 obtained them. Source-1 simply checked the necessary boxes on the form and returned it to the I-Exchange employees. Source-1 stated that Source-1 never observed I-Exchange employees or ZEER ever question anyone about how the phones were obtained. No matter how many phones Source-1 brought to I-Exchange, Source-1 was never questioned about them.

13. Source-1 advised that the price paid for the phone by I-Exchange depends on the condition of the phone and the model. For example, I-Exchange will pay a recruiter approximately $580.00 for a newer model iPhone (6 or 6S Plus) that is brand new and in

the original box (less than what the iPhone was worth at the time). I-Exchange will then issue a check(s) to the recruiter for the purchased phone(s).

14. Source-1 has advised that after obtaining a check from I-Exchange, Source-1 was instructed by an I-Exchange employee to cash the check at a local liquor store. Source-1 has been advised on past occasions by I-Exchange employees that the "[the local liquor store] is run by our guys and they know about everything." Source-1 has told USSS that Source-1 understood this to mean that the recruiters will not have any problems cashing their I-Exchange checks at the local liquor store.

15. Your affiant has reviewed bank records **I-Exchange U.S. Bank xxxxxxxx6774**, and has independently corroborated that Source-1 has received numerous checks from I-Exchange.

16. Source-1 advised USSS that Source-1 has sold numerous phones to I-Exchange over the past couple of years and that I-Exchange is well aware that the phones they are buying are either stolen or obtained fraudulently because Source-1 has frequently sold multiple phones at one time to I-Exchange. This fact is additional evidence of fraudulent intent, because legitimately purchased phones are typically returned for full value to the store from which they were bought, and not resold to a third-party establishment, such as I-Exchange. Source-1 advised that on one occasion, when Source-1 initially began to sell phones to I-Exchange, one of the employees at I-Exchange asked Source-1 if the phones were "subsidized." Source-1 asked what "subsidized" meant. The employee then told

8

Source-1 "just forget it," and the employee purchased the phones. Source-1 has returned to I-Exchange many times to sell phones and has conducted transactions with the same I-Exchange employees. Source-1 has also observed other repeat customers bringing new phones into I-Exchange to sell on multiple occasions.

17. Source-1 has further advised that a former associate of I-Exchange has told Source-1 that the phones I-Exchange purchases are being sold overseas where they are paid up to two and half times above the amount they pay the recruiters for the phones.

18. Prior to selling phones to I-Exchange, Source-1 sold phones in the same manner at ART PATTO's prior business, I Buy Express. I Buy Express was located at 10175 Telegraph Road, Taylor, MI. USSS search warrants were executed at I Buy Express locations in April 2013. More than 5000 cell phones were recovered during the searches.

19. Source-1 positively identified an employee of I Buy Express, Troy Haggard, W/M, DOB: 09/27/1967, as someone Source-1 regularly talked to when selling phones at I Buy Express. On one occasion, Source-1 complained to Haggard that Source-1 was having difficulties obtaining phones. Haggard told Source-1 that Source-1 needed to "go out of town" to obtain more phones. Source-1 said Haggard knew how Source-1 and other recruiters selling their phones to I Buy Express were obtaining the phones.

20. Your affiant has also been provided information by another individual, identified as Source-2. Source-2 has provided information to task force agents participating in the

9

USSS Financial Crimes Task Force. Source-2 has provided information that has already been independently corroborated by USSS Agents concerning the ongoing fraud at I-Exchange. Additionally, the statements provided by Source-2 have been against Source-2's self-interest, therefore your affiant has deemed Source-2 to be reliable and credible.

21. Source-2 has also advised that I-Exchange is buying phones and other electronics at their store. Source-2 has advised that when selling electronic items to I-Exchange, Source-2 is provided a check as payment for the items. Like Source-1, Source-2 also advised that Source-2 was instructed by I-Exchange to cash the check at a liquor store. Source-2 has sold numerous phones and other Apple electronics that Source-2 has purchased with stolen and/or re-coded credit cards. Once Source-2 purchased the electronics, Source-2 then took them to I-Exchange and sold them. Source-2 further advised that Source-2 has personally observed phones and other Apple electronic products being loaded up into a van at I-Exchange. On one occasion, Source-2 asked one of the I-Exchange employees if Source-2 could purchase any of the Apple electronics that were being stored in the back of the I-Exchange store. The I-Exchange employee advised Source-2 that "they were already spoken for." This information is consistent with Source-1's information that the electronics are being sold overseas.

22. USPIS Inspectors and USSS Agents have conducted surveillance of both I-Exchange and the local liquor store. Observed during these surveillance operations were multiple subjects entering I-Exchange with large bags in hand and upon exiting I-

Exchange, the now empty-handed subjects immediately and directly, proceeding to the local liquor store.

23. Your affiant has also been provided information by another individual, identified as Source-3. Source-3 has provided information to task force agents participating in the USSS Financial Crimes Task Force and USPIS Inspectors. Source-3 has provided information that has been independently corroborated concerning the ongoing fraud at I-Exchange. Additionally, the statements provided by Source-3 have been against Source-3's self-interest, therefore your affiant has deemed Source-3 to be reliable and credible.

24. Source-3 has extensive knowledge on the inner workings of purchasing fraudulently obtained or stolen iPhones and other electronics from "street runners" and then re-selling them to electronic wholesale exchange distributors like Pioneer Technology Solutions and Unimaven (Technology Supplier, LLC). Both of these companies were located in the New York and New Jersey area.

25. Source-3 advised that Art Patto, the former owner of I Buy Express became partners with Harry ZEER in approximately 2014. Source-3 advised that Patto's store, I Buy Express had been "raided" by USSS Agents in approximately March-April of 2014. Your affiant notes that USSS Agents and Task Force personnel executed a search warrant for I Buy Express in April 2013. As a result, Agents retrieved approximately 5000 phones. To date, no one in that case has been charged.

26. Source-3 advised that after the civil lawsuit and the raid conducted by the USSS, Patto decided to become partners with ZEER and open up I-Exchange.

27. Source-3 advised that Patto made statements regarding the fact that I Buy purchased the iPhones through "street runners" who had obtained them by opening up accounts in other individuals' names and then committing insurance fraud through Verizon/Assurion to obtain more phones.

28. Source-3 stated that although Patto was a partner in ZEER's I-Exchange business, Patto's name did not appear in any of the paperwork. Additionally, Source-3 stated that Patto was often seen at I-Exchange and was involved in business meetings.

29. Source-3 advised that ZEER began having issues with some of his business bank accounts. Your affiant notes that ZEER had multiple I-Exchange bank accounts that were subsequently closed by the various banks. As a result, ZEER switched to issuing checks to customers ("runners") who were bringing in the stolen/fraudulently obtained phones to sell to I-Exchange, and then directing them to cash those checks at the local liquor store.

## Financial Investigation

30. USSS Investigators have reviewed multiple I-Exchange bank accounts, as well as bank accounts established for the local liquor store. Person No. 1 and

12

Person No. 2 are both listed as signatories on the accounts described in this affidavit.

31.   A review of bank records from I-Exchange **U.S. Bank 6774** revealed that I-Exchange generally broke up payments over $10,000 into two to three checks to the same individual. Each individual check issued by I-Exchange was less than $10,000.00, but together the checks exceeded $10,000.00. Thus, it appears that ZEER structured these check payments to make it easier for individuals, including Source-1, to cash the checks at the local liquor store without generating a Currency Transaction Report (CTR).

33. I-Exchange U.S. Bank 6774 shows multiple incoming deposits every month. Further review of these records shows a high volume of incoming wire transfers from the following four businesses.

      a. Conplex USA, LLC
         3058 NW 72nd Ave.
         Miami, FL 33122

      b. Pioneer Technology Solutions, LLC
         100 Tec St.
         Hicksville, NY 11801

      c. Unimaven, Inc.
         74 Green St.
         Hackensack, NJ 07601

      d. GCM Wholesale, Inc.
         7617 Payne Ave.
         Dearborn, MI 48126

Your affiant has researched these businesses through multiple internet search engines and

prior USSS investigations and have determined that they are "Electronic Wholesale Exchange" businesses.

34. Additionally, your affiant has reviewed United Parcel Service (UPS) records from May 1, 2015 to February 2016. These records reveal that there is a high volume of shipments from I-Exchange to Conplex, USA, LLC, Pioneer Technology Solutions, LLC and Technology Supplier LLC, aka Unimaven Inc. During the same time-period, there are large volumes of wire transfers coming from these electronic wholesale businesses into I-Exchange U.S. Bank 6774.

35. Your affiant has also reviewed the case file from the I Buy Express (owned and operated by PATTO) investigation mentioned earlier in this affidavit. The I Buy Express investigation revealed that after the phones were purchased by I Buy Express, they were shipped overseas. Your affiant has spoken with investigators who were involved in the I Buy investigation. They have advised that the USSS seized shipping labels and executed search warrants that show thousands of phones being shipped overseas. These phones were sold at more than double the price that I Buy paid for them.

36. Similarly, Source-1 has advised that I-Exchange is selling phones overseas. After reviewing the UPS records and U.S. Bank records for I-Exchange, your affiant believes that I-Exchange is shipping the phones they have purchased from various recruiters to

the "electronic wholesale exchange businesses" identified above, which records show are then shipped and sold overseas. There are numerous wire transfers from the electronic wholesale exchange businesses which your affiant has reviewed that are consistent with the dates and times the UPS records show that the phones are being shipped to these individual businesses.

### LeadsOnline Database

37. Your affiant reviewed an investigative database called LeadsOnline. LeadsOnline is a technology service that reports the sale of goods to secondhand dealers, such as pawnshops, gold buyers, pharmacies, and scrap metal dealers. Reports of these transactions are required by some communities, including, but not limited to Redford, Michigan. Although the vast majority of the transactions taking place in these businesses are completely legitimate, reporting laws exist because some are involved in the sale of goods related to criminal activity. LeadsOnline requires secondhand dealers to provide information such as the name of the seller, the address and the corresponding driver's license or ID # when making a transaction.

38. Your affiant has checked the names of individuals who cashed checks issued from I-Exchange U.S. Bank 6774 at the local liquor store. Based on the LeadsOnline database it appears that some of the payees on the I-Exchange checks provided fraudulent names and addresses. The LeadsOnline database included information about the payees that

appeared fraudulent, such as cities that did not belong with the provided state, such as: Mesa, Michigan and Milwaukee, Michigan, both of which do not exist.

39. For example, while reviewing the LeadsOnline database for I-Exchange customers, your affiant identified records of transactions by an individual named Kelsey Lademan. LeadsOnline records indicated that this individual sold I-Exchange 230 Apple products, including, but not limited to, Apple iPhones, between 02/08/16 and 03/13/16 totaling $170,040.00. A USSS Agent made contact with Lademan who advised that she has never sold an Apple product, nor has she ever been to the Metro PCS store located at 10001 Telegraph Rd., Redford, MI. (I-Exchange). She immediately informed the USSS Agent of an identity theft report she filed in 2014 after identifying accounts opened in her name of which she had no knowledge.

40. The LeadsOnline searches also identified that many of the payees of the I-Exchange checks have criminal histories, active warrants and suspended driver's licenses. Multiple attempts were made to locate numerous payees, but was unsuccessful due to the payees living at various addresses.

### Verizon Wireless Investigation

41. Your affiant and other USSS Agents have been assisted in this investigation by Verizon Wireless Corporate investigators. These investigators are familiar with the fraud described in this affidavit based on their previous investigations for Verizon. Every

iPhone has a unique 15-digit international mobile equipment identity ("IMEI") number that identifies it on a cellular network. A USSS Agent provided the Verizon investigators with some of the IMEI numbers obtained from the LeadsOnline database report generated by I-Exchange. These IMEI numbers came from recruiters who sold various models of iPhones to I-Exchange. Verizon investigators advised a USSS Agent that of the 374 phones listed in the LeadsOnline database report, Verizon was able to identify 175 of the phones as being fraudulently obtained, with many of the other phones in the report having no history of activation, and the associated contracts having no payments towards them. Based on the investigation, your affiant has reason to believe these phones were fraudulently purchased by mules at the recruiter's request, and that the recruiters then sold the phones to I-Exchange.

42. Additionally, the USSS requested that Verizon Investigators search their database for all individuals in a 25-mile radius of Detroit who entered into contracts for iPhones with Verizon and never paid any monthly installments for that phone and service contract. Verizon investigators provided a list of approximately 2500 names of individuals who purchased an iPhone and Verizon contract, but never made any payments. This is consistent with Source-1's information, which described the pattern of fraud to investigators as to how recruiters paid "mules" to enter into fraudulent contracts with Verizon as a means of obtaining a brand new iPhone that the recruiter (including Source-1) would re-sell to I-Exchange.

43. On May 18, 2016, USSS Agents and USPIS conducted an undercover operation with Source-1 at I-Exchange and the local liquor store. USSS Agents obtained 15 iPhones from Verizon and gave to Source-1. Source-1 then drove to I-Exchange, and sold all 15 of the iPhones to I-Exchange. Source-1 was paid with two checks. Source-1 drove to the local liquor store where the two checks from I-Exchange were simultaneously cashed.

44. On May 18, 2016, USSS Agents and USPIS Inspectors obtained and executed search warrants at I-Exchange, the local liquor store, and distributors in New York and New Jersey. Approximately 3,500 electronic items were seized as a result of the search warrants. Additionally, the Government obtained seizure warrants for approximately 14 accounts resulting in the seizure of approximately $3.2 million dollars.

45. On January 11, 2017, USSS Agent and USPIS Inspector interviewed Employee-1 of I-Exchange. Employee-1 stated that it seemed obvious that the iPhones being brought into I-Exchange were stolen, because they were all brand new iPhones. Employee-1 explained he was instructed to switch out subscriber identity module ("SIM") cards, which is designed to identify and authenticate subscribers, on every iPhone.

46. On January 11, 2017, USSS Agent and USPIS Inspector interviewed Employee-2 of I-Exchange. Employee-2 explained that customers of I-Exchange

were advised to cash their checks at the local liquor store. Employee-2 expressed that the iPhones were not legitimate, but did not ask the employer any questions.

47.  On January 11, 2017, USSS Agent and USPIS Inspector interviewed Employee-3 of I-Exchange. Employee-3 explained that the customers of I-Exchange were instructed to cash the I-Exchange checks at the local liquor store. Employee-3 asked ZEER if the iPhones were legal and ZEER instructed Employee-3 to follow the procedure of having the customers sign the form asking if the iPhones were stolen or subsidized and it would be legal. Employee-3 was instructed to remove all SIM cards from the iPhones and to make sure all the iPhones were unlocked.

48.  On February 9, 2017, USSS Agent and USPIS Inspector interviewed Employee-4 of I-Exchange. Employee-4 explained that it was ZEER's procedure to issue customers multiple checks when payment due was in excess of $10,000.

## CONCLUSION

49.  Your affiant submits that there is probable cause to believe that HARRY ZEER and ART PATTO knowingly purchased, received sold, and transported stolen goods in interstate commerce, and conspired with each other to do so in violations of 18 U.S.C. § 2314 (transportation of stolen goods), § 2315 (sale or

receipt of stolen goods), § 371 (conspiracy).

_____
Tyler Bennett, Special Agent
U.S. Secret Service

Sworn to before me and signed in my presence
And/or by reliable electronic means.

_____
Honorable R. Steven Whalen
United States Magistrate Judge    February 3, 2021

20